## THERMOID RUBBER CO. v. BANK OF GREENWOOD et al.

(Circuit Court of Appeals, Fourth Circuit. September 29, 1924.)

No. 2190.

1. **Fraud ☞64(1)—Failure to submit issue to jury held error.**

Allegations in a complaint of fraud of a defendant *held* broad enough to raise an issue which should have been submitted to the jury, where the evidence was conflicting.

2. **Fraud ☞27—Causing purchase of goods by another with intent that they shall not be paid for held actionable.**

Causing the purchase of goods by another on credit, intending at the time that they shall not be paid for, is in itself an actionable wrong, regardless of the means used.

3. **Fraud ☞16—Misleading, by stating only part of truth, may create legal liability.**

One may deceive. though he says nothing but the truth; and if he effectively misleads another to his injury by stating only part of the truth, he may be legally as well as morally liable.

4. **Fraud ☞65(1)—Instruction held erroneous as applied to facts.**

An instruction that plaintiff could not recover because of a misleading report as to the credit of a customer, alleged to have been fraudulent, if it had already contracted for sale of the goods before the report was received, *held* erroneous, where the contract expressly provided that plaintiff might cease shipments at any time, if dissatisfied with the financial responsibility of the buyer.

5. **Fraud ☞65(1)—Instruction held erroneous, as inapplicable to issue.**

Under a complaint charging defendants with purposely giving misleading information to plaintiff respecting the financial responsibility of a customer, which plaintiff acted on to its injury, an instruction that one paid for information is under a different obligation from one who furnishes it gratuitously *held* erroneous, as not applicable to the issue and misleading.

6. **Trial ☞210(1)—Giving of instruction that testimony of a coconspirator should be received with caution held not error.**

The giving of an instruction in a civil action that the testimony of an admitted coconspirator should be received with caution *held* not reversible error.

7. **Fraud ☞58(1)—Charge that mere preponderance of evidence is not sufficient to establish fraud held not erroneous.**

Where fraud was charged, an instruction that the burden rested on plaintiff to establish the charge by evidence that "is clear and satisfactory," and that "a preponderance of evidence that is vague and ambiguous is not sufficient," *held* not erroneous.

In Error to the District Court of the United States for the Western District of South Carolina, at Greenville; Henry H. Watkins, Judge.

Action at law by the Thermoid Rubber Company against the Bank of Greenwood and J. C. Self. Judgment for defendants, and plaintiff brings error. Reversed.

Douglas Featherstone, of Greenwood, S. C., and H. K. Osborne, of Spartanburg, S. C. (Bomar, Osborne & Brown, of Spartanburg, S. C., and Mays & Featherstone, of Greenwood, S. C., on the brief), for plaintiff in error.

F. B. Grier, of Greenwood, S. C., and H. J. Haynsworth, of Greenville, S. C. (Grier, Park & McDonald, of Greenwood, S. C., and Haynsworth & Haynsworth, of Greenville, S. C., on the brief), for defendants in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The parties occupied the same position below as they have here; that is to say, the Thermoid Rubber Company, a New Jersey corporation, now plaintiff in error, sued the Bank of Greenwood, incorporated under the laws of South Carolina, and one J. C. Self, a citizen of the latter state, who are in this court defendants in error. For brevity, the parties will be spoken of as the Thermoid, the Bank, and J. C. Self, respectively.

The controversy, grows out of the insolvency of the Owen Tire & Rubber Company, another South Carolina corporation and herein styled the Tire Company. It began business in the early part of 1919, and when less than three years later, in September, 1921, it passed into the hands of a creditors' committee, it owed the Thermoid upwards of $50,000 for merchandise, all of which had been purchased and delivered within the preceding four months. The Tire Company's nominal capital never exceeded $25,000, and the record is not quite clear as to whether all of this was ever paid in. It appears that only three persons had ever had any interest in it. They were one W. C. Owen, from whom it took its name, and who was primarily responsible for its organization, the defendant J. C. Self, and the latter's brother, W. O. Self. For the preceding 10 years, in Greenwood, S. C., Owen, together with his wife, two brothers, and a sister, had been engaged in what he described as the monumental stone line; that is, as we understand it, the making of cemetery monuments, tombstones, and the like. In the latter part

of 1919 he made up his mind to become a dealer in tires. The record does not disclose that he had had any previous experience in that line of activity. The defendant J. C. Self agreed to take 40 per cent. of the stock of the new company, and it had no difficulty in arranging for a line of credit with the Bank. Not long after its organization, W. O. Self, a brother of the defendant J. C. Self, became bookkeeper for it. He purchased some of Owen's stock, paying for it $150 per share. He also bought, or agreed to buy, some of J. C. Self's. According to the account given by the last named, W. O. Self ultimately took over all of his brother's holdings, although on the Tire Company's books some of the shares still remain in J. C. Self's name.

The Tire Company came into being at a time of active demand and of rapidly advancing prices. Those in charge of it, like thousands of others in varied lines of enterprise, seemed to have assumed that the conditions of 1919 would continue indefinitely, and that in consequence the more the company bought the greater its profits would be. In proportion to the volume of business it did, its capital was scarcely more than nominal, and yet during the first 16 months of its existence it appears to have paid its merchandise bills promptly. Even in boom times, such an extension of its activities would have been impossible, had it not been that for a while at least it had the well-nigh unlimited backing of the Bank. At one time it was using upwards of $400,000 of the latter's money, a sum which was much greater than the aggregate of the Bank's own capital, surplus and undivided profits. The defendant J. C. Self had for years been connected with the Bank, and was at the time with which we are concerned chairman of its board of directors. He was extensively engaged in the cotton manufacturing business, and apparently owned the whole or the controlling interest in the stock of the two mills he managed. He was and to all appearances still is a man of much substance. The Thermoid stresses these facts as showing that the Bank was completely under his domination, so far at least as concerned its transactions with the Tire Company, and that as to them what he willed it did.

Both the defendants deny that such was the case, but J. C. Self admits he knew the Bank made the large advances because he was connected with the Tire Company, and he says in consequence he felt in honor bound to see that the Bank lost nothing by them. As we understand the record, he has

done so. Although in January, 1921, the Bank for some reason loaned the Tire Company another $12,000, the period of .16 months from May, 1920, to the bankruptcy, was as between them one of liquidation. During that time the Tire Company reduced its indebtedness to the Bank from $406,000 to about $170,000, all of which, at or before the Tire Company collapsed, had been assumed by J. C. Self, or by a corporation under his control. As early as January, 1921, and before there had been any transactions between the Thermoid and the Tire Company, J. C. Self, in the name of one of his mill companies, had purchased from the Bank $100,000 of the Tire Company's notes, which were indorsed by the Bank without recourse. From May, 1920, the Tire Company did relatively little business. Its sales were comparatively small. What goods it put out were as a rule upon consignment. Its purchases between the spring of 1920 and that of 1921 did not amount to much. Little, if anything, heretofore stated, is, as we understand the record, disputed. The serious conflict of testimony is as to other matters.

As the case must go back for a new trial we shall say no more on the controverted issues than is necessary to make clear our reasons for the conclusions to which we have come. Owen was examined as a witness for the Thermoid. His testimony, if the jury believed it, would have justified a finding that in the winter and early spring of 1921 J. C. Self had instructed him to buy much larger quantities of tires than the legitimate needs of the business required, so that, when the crash then plainly foreseeable came, the gross value of the assets of the Tire Company would be greater than would otherwise have been the case, and the dividends of the Bank, or in effect of J. C. Self, larger, and that to make possible such purchases J. C. Self told Owen to refer those from whom he ordered tires to the Bank and that he, J. C. Self, would have the inquiries answered by Mr. Watson, the vice president of the Bank and the official most active in its daily conduct. After the date of this talk, and, as Owen swears, in consequence of it, he, in the name of the Tire Company, ordered $50,000 worth of tires from the Thermoid. They were delivered, but were never paid for. J. C. Self denied having had any such conversation, or that he ever had any part or lot in any such fraudulent scheme, or any knowledge of it.

[1, 2] It is not for us to say where the truth lies. That is a jury question. In his

instructions below, the learned judge practically withdrew this issue from the jury, because, as he understood the pleadings, the Thermoid based its right to recover solely upon a letter written in the name of the Bank by Watson to the Thermoid, in answer to an inquiry made by the latter as to the financial responsibility of the Tire Company. It is true that the complaint of the Thermoid, after having alleged the scheme to defraud persons who could be induced to sell tires to the Tire Company, as we have already summarized it, and after having charged that it was participated in by the Bank, as well as by J. C. Self, did say that a part of it was that the Bank, through Watson, should make and issue to manufacturers and dealers, including the Thermoid, false and fraudulent reports of the financial condition of the Tire Company. The complaint then specifically charged the writing by the Bank of the letter before referred to and hereinafter more fully set out. In our view, under such a pleading, the plaintiff was entitled, as against J. C. Self, to recover if the jury found that the purchase of the tires was brought about by him with the fraudulent intent alleged. If, at the time he advised or directed their ordering, he did not purpose that they should be paid for, he is liable, irrespective of whether he or the Bank at his instance did or did not make any false representations as to the financial condition of the Tire Company. To cause the purchase of goods on credit, intending at the time the purchase is made that they shall not be paid for, is itself an actionable wrong, and is sufficiently charged in the Thermoid's initial pleading.

On May 25, 1921, Owen, in the name of the Tire Company, wrote to the Thermoid, asking for a price list on tires and tubes, and inquiring whether the Thermoid was in position to offer a distributor's proposition in the states of North and South Carolina to a dealer who was able to give not less than $300,000 of business per year out of the territory. It will be noted this letter was written subsequent to the time at which Owen says he and Self entered into the fraudulent scheme already stated. In consequence of the receipt of this letter by the Thermoid, two of its representatives early in June came to Greenwood to see Owen. On the 6th of that month, the interview between them resulted in an agreement by which the Thermoid granted the Tire Company the exclusive right to sell certain of its goods in South Carolina and in upwards of 50 counties of North Carolina. In re-

turn, the Tire Company agreed to buy merchandise in the year 1921 to the minimum amount of $100,000, in 1922 to that of $200,000, and in 1923 to that of $300,000.

There is some controversy as to whether the officials who signed the contract on behalf of the Thermoid had the authority to bind it, but in view of a provision it contained we think it is immaterial whether they had or had not. It specifically declared that the Thermoid, whenever it was not satisfied as to the Tire Company's financial responsibility, might decline to make delivery under the contract, except for cash, and in that event all the accounts arising out of sales made under the agreement were to become immediately due and payable. Between the 6th of June, when the agreement bore date, and the 23d of that month, inclusive, the Thermoid had shipped to the Tire Company some $3,600 worth of goods. Whether it should ship $16,000 more was then under consideration, and on the last-named date June 23, 1921, the Thermoid wrote to the Bank, inquiring as to the credit of the Tire Company. Among other things, it said that, from the reports filed with the commercial agencies, it appeared that at times the Tire Company had secured from the Bank loans of considerable amounts, and asked on what basis the loans were made; that is to say, whether they were secured by the indorsements of individuals or otherwise.

To this communication, on the 25th of June, the Bank, in a letter written by Watson, its vice president and signed by him, answered that the Bank had carried the accounts of the Tire Company since its organization and from time to time had been called on to loan it money and had done so, and all that it had loaned had been on the Tire Company's own paper. The letter said that the loans had proven very satisfactory to the Bank and had been very materially reduced. It thought that the Tire Company had met all the obligations with the trade, and it considered them in good shape. It said the business was managed by Owen who bore a splendid reputation for honesty, integrity and good moral character. The letter closed with the statement that without prejudice or responsibility the Bank would consider the Tire Company as having made successful progress, and as worthy of a line of credit with the Thermoid. As will be noted, this letter said that the Bank had made all its loans upon the single name paper of the Tire Company. In a sense, at least, this was literally true, and yet there

was evidence from which the jury might have found that the loans were made largely, if not solely, because the Bank and J. C. Self regarded the latter as personally responsible for their repayment, and that because such was the real understanding J. C. Self had, some months before the letter was written, caused one of his mill companies to purchase from the Bank $100,000 of the Tire Company's paper without recourse.

The statement that the Tire Company had materially reduced its indebtedness to the Bank was also literally true. Thirteen months before it had owed the Bank $400,-000. When the letter was written, on the books of the Bank the Tire Company was debtor to the amount of only about $100,000, and it is possible that Watson, who wrote the letter, did not know that the $100,000 of the Tire Company's notes purchased some months previous by one of J. C. Self's cotton mills was still unpaid. It may be that Watson, from his standpoint, regarded the Bank's loans to the Tire Company as very satisfactory. J. C. Self was solvent, and if he accepted liability for them the Bank could lose nothing, and it had earned good interest upon them.

[3, 4] One may deceive, though he says nothing which is itself untrue. The telling of but part of the truth may sometimes effectually mislead. If A., in answering a question of B's, chooses what he shall say and what he shall keep to himself, with a purpose of leading B. to a wrong conclusion, he is morally a deceiver. If B. understands the fact to be as A. has intended he should, A. may be legally liable as well. In order that he shall be, it is necessary that B. shall have acted upon that conclusion to his hurt, as the learned court below correctly told the jury; but in its comments upon this part of the case, we think it fell into error when it instructed the jury that if, before the Thermoid received the letter from the Bank, it had made or ratified the contract earlier herein described, it was not entitled to recover, no matter what view the jury might take of the truthfulness of the statements in the letter, or of the knowledge and intent with which they were made. The view of the court was that, if the contract had become binding upon the Thermoid before it received the Bank's letter, that letter did it no harm; but such a holding ignored the provision to which reference has already been made, and by which the Thermoid reserved the right to cease to fill any orders after it became dissatisfied with the financial responsibility of the Tire Company. If

when, after it made its comparatively small early shipments, the Thermoid began to doubt the credit of the Tire Company, it had the right to stop shipping to it. If, having that right in mind, it made inquiries of the Bank and received from the latter false information, and relying upon its truth continued to make shipments in much larger quantities than before, it did that which it otherwise would not have done, and suffered in consequence.

[5] The Thermoid also assigns as error that part of the charge of the court in which the jury was told that, where one is paid for information, it incurs a somewhat different obligation from one who is giving information as a gratuity, and that the Bank of Greenwood was giving it gratis. Doubtless one who accepts payment for information may impose upon himself other obligations than are assumed by one who gives it gratuitously. Nevertheless, under the facts of this case, what the learned judge said may reasonably have misled the jury. The Bank was not charged with a negligent failure to make inquiry as to the financial condition of the Tire Company. If it was liable at all, it was liable for stating as true something it knew to be untrue, or about which it knew it was in ignorance. The duty not to do either of those things is as incumbent upon one who gratuitously furnishes information which he knows or has reason to believe his inquirer may act upon to his hurt as it is upon one who is paid for answering. Moreover, if the plaintiff's theory of the evidence in the instant case is correct, it is scarcely true to say that the Bank was giving information gratis. If the Bank was co-operating with Self in a scheme to induce sellers of merchandise to sell and deliver goods to the Tire Company, in order that Self and the Bank might ultimately get a larger proportion of their claim out of these improperly swollen assets than would otherwise be possible, it was not in any proper sense of the term acting gratuitously. It was an interested party. We, of course, do not for one moment intimate any opinion as to whether the jury should or should not find the existence of any such motive on the part of the Bank.

[6] The Thermoid says the court erred when it told the jury that, as Owen was by his own account a coconspirator, they should receive his testimony with caution. It argues that such an instruction, proper in a criminal case, is out of place in a civil. It is true that there are few precedents, if any, of its use in the latter, unless the co-

conspirator is testifying in his own interest. In a criminal prosecution, as a rule an accomplice has a far stronger motive for putting the guilt upon his alleged associate than will usually be found in a civil proceeding. The Thermoid may be justified in claiming, as it does, that from this record it is not easy to understand why Owen should have told the story he did, unless it was true; but, even so, the Thermoid was left free so to argue to the jury. If the learned judge below thought that Owen's testimony should be received with caution, the Thermoid may not complain because he told the jury so.

[7] The Thermoid also objects to that part of the charge of the court in which it said to the jury that, as the Bank and J. C. Self were "presumed, in absence of proof to the contrary, to be innocent and honest, and to have acted in good faith, the burden was on the Thermoid to establish the contrary by a preponderance of evidence that is clear and satisfactory to you. A preponderance of evidence that is vague and ambiguous is not sufficient. It must do more than raise a suspicion. It must satisfy you of the guilty conduct of the defendants as charged." The view of the Thermoid is that, while in criminal cases the facts necessary to sustain a verdict of guilty must be true beyond the possibility of a reasonable doubt, in civil a preponderance of evidence is all that is required to sustain a verdict. It says there is no middle ground, and that the court fell into error when it told the jury that in this class of civil cases a greater degree of preponderance is required than in others. The language used by the learned judge is an almost literal quotation from Lalone v. United States, 164 U. S. 255, 17 S. Ct. 74, 41 L. Ed. 425, and there was no error in employing it.

The Thermoid further complains that the learned judge below told the jury: "I don't think a bank would be liable, if some particular officer would answer a letter of which other officers had knowledge, but of which this particular officer had no knowledge." In substance it says that this statement took from the jury the right to consider whether J. C. Self, as an individual and as chairman of the board of directors of the bank, had not used Watson as a tool to further the fraudulent purpose of both the defendants. It argues that, if such was the case, it makes no difference that Watson may have been altogether personally innocent of any intent of wrongdoing. It goes without saying that, if the language of the court above

quoted had the effect attributed to it by the Thermoid, there was error. In view of other portions of the instructions, we are not convinced that the jury understood it to go as far as the Thermoid now contends; but, as the case must in any event go back, a further discussion of this particular point is unnecessary. It may not arise at the new trial. While the jury, if it sees fit, may find against J. C. Self and not against the Bank, the latter cannot be held liable unless he is. He is personally solvent, and if the Thermoid can recover a judgment against him, it may conceivably care little whether it gets one against the Bank or not.

For the reasons already stated, the judgment below must be reversed, and the case remanded for a new trial.

Reversed.