**Suzanne Q. LITTLE, Individually and as Personal Representative of the Estate of Samuel Martin Little, Deceased, Plaintiff,**

v.

**BROWN & WILLIAMSON TOBACCO CORPORATION, Individually and as Successor by Merger to the American Tobacco Company, and R.J. Reynolds Tobacco Company, Defendants.**

No. CIV.A.2:98–1879–23.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 4, 2001.

Cynthia Anne Solomon, Frederick Baker Baker, Ness Motley Loadholt Richardson and Poole, Mt. Pleasant, SC, for Plaintiff.

Wilburn Brewer, Jr., Nexsen Pruet Jacobs and Pollard, Colombia, SC, Jennifer N. Stephens, S. Stewart Haskins, Gordon A. Smith, King and Spalding, Atlanta, GA, Paul A. Dominick, Nexsen Pruet Jacobs Pollard and Robinson, Charleston, SC, Thomas E. Riley, Bruce G. Sheffler, Gregory M. Loss, Chadbourne and Parke, New York City, W. Randall Bassett, Atlanta, GA, Randal S. Baringer, Jones Day Reavis and Pogue, Cleveland, OH, Mark Christopher Fava, Atlanta, GA, for Defendants.

### *ORDER*

DUFFY, District Judge.

This matter is before the court upon Defendant R.J. Reynolds Tobacco Company's ("Reynolds") and Defendant Brown & Williamson Tobacco Company's ("B & W") motions for summary judgment on Plaintiff Suzanne Little's claims to recover for the alleged smoking-related injuries of her late husband, Samuel Martin Little.

## I. BACKGROUND

Viewed in the light most favorable to Plaintiff Suzanne Little ("Plaintiff"), the facts of this case are as follows: Martin Little smoked his first cigarette in approximately 1956 at the age of eleven, and began smoking cigarettes regularly in approximately 1961 at the age of sixteen. M. Little 10/26/98 Dep. at 116–20; M. Little 3/22/99 Dep. at 10–11. From about the age of sixteen until sometime in the 1970's, Mr. Little regularly smoked Reynolds' Winston cigarettes, a higher tar, higher nicotine brand. M. Little 10/26/98 Dep. at 114–16 (stating that, being "pretty much brand-loyal," he smoked Winston for fifteen years or longer). At some point in the 1970's, Mr. Little began trying several different low-tar brands in an attempt to switch to a "healthier" cigarette, with his ultimate goal being to use low-tar, low-nicotine cigarettes as a "stepping stone" to quitting smoking altogether. *Id.* at 128; M. Little 2/24/99 Dep. at 50–51. In the course of switching down, Mr. Little tinkered with several different low-tar brands, including Carlton, Barclay, Winston Lights, and what he recalls as "Ultra." M. Little 2/24/99 Dep. at 64, 66–67; M. Little 3/22/99 Dep. at 88–89. Though Mr. Little could not recall the exact order in which he experimented with the various brands, he eventually settled on Carlton as his regular low-tar brand. *Id.;* M. Little 2/24/99 Dep. at 50–51, 60–61. However, despite numerous attempts to quit, Mr. Little was unsuccessful, and he continued to smoke Carlton regularly until doctors diagnosed him with lung cancer in late 1995. M. Little 10/27/98 Dep. at 264–66. Shortly thereafter, in December 1995, Mr. Little was finally able to quit smoking altogether. *Id.*

Mr. Little originally brought this action on May 26, 1998 in state court. Defendants removed the case to this court on June 26, 1998. On May 1, 1999, Mr. Little passed away. Plaintiff filed a Second Amended Complaint on July 9, 1999.

On June 9, 2000, Reynolds filed the instant motion for summary judgment, accompanied by a supporting memorandum. Brown & Williamson did likewise on the same date, followed by an amended memorandum on June 14. Plaintiff filed separate response memoranda to both motions on June 30, and Reynolds and B & W replied separately on July 24.

## II. SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that par-

ty's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

## III. DISCUSSION

### A. Whether the Statute of Limitations Bars Plaintiff's Claims against Defendants

Reynolds and B & W[1] contend that while Mr. Little was not diagnosed with lung cancer until December 1995, discovery has revealed that Mr. Little had actual, or at least constructive, knowledge of an injury caused by his cigarette smoking as early as 1993. Since Mr. Little filed this lawsuit on May 26, 1998, Defendants maintain that the court should grant summary judgment on Plaintiff's claims because they are untimely under South Carolina's three-year statute of limitations, S.C.Code Ann. §§ 15–3–530(5) & (7) (Law. Co-op.1976).

"The burden of establishing the bar of the statute of limitations rests upon the one interposing it, ... and where the testimony is conflicting upon the question, it becomes an issue for the jury to decide." *Brown v. Finger,* 240 S.C. 102, 124 S.E.2d 781, 786 (1962) (citations omitted). South Carolina's three-year limitations period commences running "after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action." S.C.Code Ann. § 15–3–535. As stated by the South Carolina Supreme Court.

> [t]he exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist. The statute of limitations begins to run from this point and not when advice of counsel is sought or a full-blown theory of recovery developed.

*Wiggins v. Edwards,* 314 S.C. 126, 442 S.E.2d 169, 170 (1994) (quoting *Snell v. Columbia Gun Exchange, Inc.,* 276 S.C. 301, 278 S.E.2d 333, 334 (1981)). This is an objective determination in which courts must focus on the date of discovery of the injury, not the date of discovery of the wrongdoer:

> The important date under the discovery rule is the date that a plaintiff discovers the injury, not the date of the discovery of the identity of another alleged wrongdoer. If, on the date of injury, a plaintiff knows or should know that she had some claim against someone else, the statute of limitations begins to run for all claims based on that injury.

*Id.* (quoting *Tollison v. B & J Mach. Co.,* 812 F.Supp. 618, 620 (D.S.C.1993)). Thus, under South Carolina case law, after a plaintiff has discovered or should have discovered his injury, his claims arising out of that injury have accrued and the three-year statute of limitations begins running, even if he does not know the full extent of his injuries.

In this case, on June 2, 1993, Mr. Little underwent a general physical examination, performed by his treating physi-

---

1. B & W has adopted and incorporated Reynolds' argument that Plaintiff's claims are barred by the statute of limitations. Def. B & W's Mem. at 1–2.

cian, Dr. John Dubois. During the examination, Mr. Little requested a chest x-ray. As stated in the Radiology Report, that x-ray revealed "a 1.5 cm nodular density overlying the left second anterior rib, which likely represents a[sic] intraosseous process, but a pulmonary parenchymal nodule cannot be excluded." Radiology Report 6/2/93, Def. Reynolds' Ex. C. Defendants point out that several experts have testified that the nodular density discovered on Mr. Little's June 1993 x-ray was the same cancer that was diagnosed two-and-a-half years later in December 1995.

Defendants thus contend that Mr. Little knew, or should have known, about his cancer in 1993 for several reasons. First, Defendants maintain that Dr. Dubois reviewed the June 1993 x-ray and Radiology Report, concluded that it was "abnormal," and informed Mr. Little of his conclusion. However, an examination of Dr. Dubois' deposition testimony reveals otherwise:

Q: All right. And your testimony is that you did, in fact, advise Mr. Little of the results of this 1993 chest x-ray, correct?

A: Yeah. It's my standard practice to notify patients of the results of their tests, because they want to know it. And we do that every day; we do that. But I don't have the documentation that it was ever done, *so I don't know what I said or did.*

Q: Now, the radiologists had advised-the two radiologists who prepared the report had advised that Mr. Little needed a follow-up x-ray, correct?

A: Correct.

Q: Did you tell Mr. Little that he needed a follow-up x-ray?

A: I have no documentation of that.

Q: Do you know one way or another?

A: *Can't remember.*

Q: In your original copy of the radiology report ... where you testified a few minutes ago is marked "Abnormal," did you tell Mr. Little [about] the information there marked "Abnormal"?

A: I have no documentation of that.

Q: Do you remember one way or another?

A: *I don't remember.* Honestly, I don't. I probably would have. The only fuss I would have on this is that-I believe I had reviewed the film at that point in time and had felt-had not felt that the findings-*I felt-have not felt that the findings were hugely significant,* I'll tell you that ...

. . . . .

Q: It was your practice back in 1993, if a radiologist suggested follow-up x-rays, to advise the patient that they needed follow-up x-rays, correct?

A: Yeah, usual life [sic], not all the time.

Q: Well, if a radiologist says, "Here's my report, this patient needs follow-up x-rays," you wouldn't just sit on that, would you?

A: No. Sometimes I would say, "No, because, clinically, that doesn't make sense; he doesn't need a follow-up x-ray. It doesn't make any sense to have it done," so I might not have.

Q: So with respect to Mr. Little, you have no recollection one way or the other?

A: I can't recommend [sic] either way. The only thing that I would think today, is that seeing what I had seen, getting-how can I say this? *This isn't an x-ray that lighted up my eyes and said, "Oh, my goodness, he needs a follow-up x-ray."*

Q: That's your view today.

A: We think the radiologist was being over-cautious on this.

Dubois Dep. at 36–38 (emphasis added).

In light of the above-quoted testimony, Defendants' assertions that "Dr. Dubois

testified that ... he did, in fact, tell Mr. Little in 1993 that his x-ray was abnormal," Def. Reynolds' Mem. at 8–9, that he informed Mr. Little that "he needed to come in for further radiologic testing," *id.* at 13, and that Mr. Little "ignored this advice despite his knowledge that something was obviously wrong," *id.*, are very misleading.[2] The court also rejects the argument by Defendants that Mr. Little was put on notice by Dr. Dubois that an "abnormal" nodular density had been discovered in his lungs, and that follow-up x-rays were needed.[3]

Defendants further contend that even if Dubois did not inform Mr. Little of such information, a person with common knowledge exercising reasonable diligence would have known that he had a cause of action because Mr. Little's nodular density was clearly noted in the June 1993 x-ray report. However, Dubois testified that the x-ray results did not cause him much alarm, or lead him to believe that follow-up x-rays were necessary. During Dubois' deposition, he identified the word "bronchitis" in his handwriting on his copy of the radiology report, and testified that he would not have made this notation had he not viewed the original radiology first, and concluded that it signified that Mr. Little was in all likelihood suffering from bronchitis. Dubois Dep. at 32–33. Even if Mr. Little did view the x-ray reports,[4] or if knowledge of the findings contained in those reports was to be imputed to Mr. Little, the court declines to charge Mr.

Little with more knowledge than his treating physician. Knowledge of the radiology report's contents would not have put a person of common knowledge and experience on notice that some right of his might have been invaded.

Dr. Dubois still does not believe that Mr. Little exhibited any symptoms indicative of lung cancer in 1993, Dubois Dep. at 62–63, and he "wasn't clinically ill to justify treatment for anything," *id.* at 39. Dr. Dubois agreed that he "never treated Mr. Little for any type of respiratory problem" prior to November 1995. While Mr. Little may have been worried since the 1970's that he might eventually develop lung cancer due to his cigarette smoking, in 1993 he had no reason to believe that his fears had been realized. In light of the foregoing, an issue of fact clearly exists regarding whether Mr. Little's June 1993 chest x-ray would have put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist. Accordingly, the court rejects Defendants' contention that as a matter of law, South Carolina's three-year statute of limitations bars Plaintiff's claims.

## B. Whether Plaintiff May Maintain her Product Liability Claims Against Defendants

■ Under South Carolina law a plaintiff may bring a product liability claim under several theories, including negligence and strict liability, as Plaintiff has done in this case. *Talkington v. Atria Reclamelucifers Fabrieken BV (Cricket*

---

2. The court further notes that while Dr. Dubois testified that it was his usual practice to send a letter to patients informing them of their test results, no copy of such a letter could be found in Mr. Little's patient file, nor was there an entry in Mr. Little's computer file that such a letter had been sent. Dubois Dep. at 34–36. However, Dubois testified that this does not automatically signify that no such letter was sent to Mr. Little.

3. Moreover, there is nothing in the record which would support a finding that the radiologists told Mr. Little of their findings and recommendation for follow-up testing. Rather, Dr. Dubois testified that the radiologists sent their report to him, not Mr. Little. Dubois Dep. at 32.

4. The record offers no support for this.

*BV)*, 152 F.3d 254, 261 (4th Cir.1998) (stating that South Carolina appellate courts have consistently recognized this) (citations omitted). In a product liability action brought under both negligence and strict liability theories, the plaintiff must show "(1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user." [5]

Reynolds and B & W argue that they are entitled to summary judgment on Plaintiff's product liability claims,[6] both in negligence and strict liability, for the following reasons:

> (1) [Defendants'] cigarettes are not defective as a matter of law; (2) [Defendants'] cigarettes are not unreasonably dangerous because the dangers of smoking have been commonly known throughout Mr. Little's lifetime; and (3) Plaintiff cannot meet her burden to prove a safer and alternative design for [Defendants'] cigarettes.

Def. Reynolds' Mem. at 14.

### 1. Whether Defendants' Cigarettes are Defective as a Matter of Law

South Carolina law incorporates almost verbatim Restatement (Second) of Torts

§ 402A. *See Barnwell v. Barber–Colman Co.*, 301 S.C. 534, 393 S.E.2d 162, 163 (1989); S.C.Code Ann. § 15–73–10 (Law. Co-op.1976); *Vaughn v. Nissan Motor Corp. in U.S.A., Inc.*, 77 F.3d 736, 738 (4th Cir.1996) (stating that South Carolina "adopts the formula of Restatement (Second) of Torts § 402A for imposing strict liability on the seller of a defective product"). Furthermore, S.C.Code Ann. § 15–73–30 provides that "[c]omments to § 402A of the Restatement of Torts, Second, are incorporated herein by reference thereto as the legislative intent of this chapter." Comment i to Section 402A states that for a product to be "defective" or "unreasonably dangerous":

> The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

Restatement (Second) of Torts § 402A cmt. i (1965). Comment i also states:

> Many products cannot possibly be made safe for all consumption.... Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey containing a dangerous amount of fusel oil, is unrea-

---

**5.** *Allen v. Long Mfg. NC, Inc.*, 332 S.C. 422, 505 S.E.2d 354, 356 (1998) (quoting *Madden v. Cox*, 284 S.C. 574, 328 S.E.2d 108, 112 (1985)). Some differences do exist, however, between product liability claims brought under negligence and strict liability theories. Under negligence theory, the plaintiff has the additional burden of proving the seller or manufacturer "failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault." *Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 462 S.E.2d 321, 326 (1995) (citations omitted). Thus,

[t]he distinction between strict liability and negligence in design-defect and failure-to-warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.

*Talkington*, 152 F.3d at 262 (quoting *Bragg*, 462 S.E.2d at 326 (quoting *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn.1984))).

**6.** B & W has adopted and incorporated Reynolds' arguments on this point. Def. B & W's Mem. at 1–2.

sonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful . . . .

*Id.*

Defendants argue that the statement in comment i regarding "good tobacco" illustrates that cigarettes cannot as a matter of law be held unreasonably dangerous or defective, as "this theory of products liability was never meant to be applied to cigarettes." Def. Reynolds' Mem. at 16. Defendants further point to several courts which have applied Section 402A and found that ordinary cigarettes are "not a defective or unreasonably dangerous product as a matter of law." Def. Reynolds' Mem. at 16 (citing *Green v. American Tobacco Co.,* 409 F.2d 1166 (5th Cir.1969) (en banc); *Adams v. Brown & Williamson Tobacco Corp.,* No. 93–1571–CIV–J–20 (M.D.Fla. Feb. 22, 1995) (Ex. M); *Herndon v. Brown & Williamson Tobacco Corp.,* 1993 WL 475530, at *2 (W.D.Mich. Apr.9, 1993) (Ex. N); *Gunsalus v. Celotex Corp.,* 674 F.Supp. 1149, 1158 (E.D.Pa.1987); *Hite v. R.J. Reynolds Tobacco Co.,* 396 Pa.Super. 82, 578 A.2d 417, 421 (1990)). These cases do not bind the court and the court declines to follow them. Rather, for the following reasons, the court adopts the approach of the numerous courts which have held that Section 402A does not bar a plaintiff's negligence and strict liability claims. *See, e.g., Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263, 272–73 (D.R.I.2000); *Witherspoon v. Philip Morris, Inc.,* 964 F.Supp. 455, 466 (D.D.C. 1997); *Burton v. R.J, Reynolds Tobacco Co.,* 884 F.Supp. 1515, 1522 (D.Kan.1995); *Semowich v. R.J. Reynolds Tobacco Co.,* 1988 WL 86313 (N.D.N.Y. Aug.18, 1988); *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1053 (Ind.Ct.App.1990).

▪ Initially, the court notes that because raw tobacco, unlike cigarettes, is not a manufactured product, "[i]t would have

been inappropriate for the commentators to use the terms 'mismanufactured tobacco' or 'defectively designed tobacco' in the context of [comment i's] illustration." *Rogers,* 557 N.E.2d at 1053 n. 8. Moreover,

[a]lthough 'good tobacco,' without any additives or foreign substances, may not be unreasonably dangerous, that does not automatically mean that all tobacco-containing products are not unreasonably dangerous. The cigarettes sold by defendants are manufactured products and, as such, the court finds that they are subject to design, packaging, and manufacturing variations which may render them defective even if the tobacco used in their manufacture was initially unadulterated. *Accord, Grinnell v. American Tobacco Co., Inc.,* 883 S.W.2d 791, 799 (Tex.App.—Beaumont 1994); *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1053 (1990).

*Burton,* 884 F.Supp. at 1522; *see also Guilbeault,* 84 F.Supp.2d at 272 (recognizing and adopting another court's holding that design defect claims alleging the supplementing of deleterious substances beyond those naturally occurring in tobacco "disqualify cigarettes as 'good tobacco,' and thus would allow a finding that they are defective and unreasonably dangerous") (citing *Thomas v. R.J. Reynolds Tobacco Co.,* 11 F.Supp.2d 850, 852–53 (S.D.Miss.1998)); *Witherspoon,* 964 F.Supp. at 466 (asserting that "[a]ttitudes and knowledge about cigarettes have changed immensely since [comment i] was written," and that the comment "appears to be on very shaky ground currently"); *Rogers,* 557 N.E.2d at 1053 n. 8 (maintaining that "a design defect which renders the product more addictive than it could be or addictive when it need not be at all may render the cigarette unreasonably dangerous in conjunction with its harmful qualities"). The court thus concludes that a manufactured cigarette is distinct from

raw tobacco, and that Section 402A accordingly does not bar as a matter of law all claims alleging that cigarettes are defective and unreasonably dangerous.[7]

In this case, Plaintiff asserts that her expert Dr. William Farone will testify that a cigarette contains thousands of chemicals, and that the cigarette industry has conducted research to identify and catalogue these components and to learn "how to construct a cigarette and filter combination to minimize or maximize the delivery of these various components." Farone Rule 26.09 Expert Disclosure at ¶ 9, Pl.'s Ex. 12. Plaintiff further points out that Reynolds' website lists page-after-page of various ingredients and additives contained in their cigarettes. *See e.g.,* Reynolds' List of Ingredients, Pl.'s Ex. 14. Dr. Farone testified, "no cigarette manufacturer sells tobacco rolled in paper." Farone Dep. at 474. Plaintiff will also introduce expert testimony showing that manufactured cigarettes utilize complex engineering technologies. As Reynolds' own memorandum states the tobacco industry is "a specialized, highly ritualized and stylized segment of the pharmaceutical industry," and its product is "a vehicle for delivery of nicotine," "a potent drug with a variety of physiological effects." Reynolds Research Planning Memorandum on the Nature of the Tobacco Business and the Crucial Role of Nicotine Therein, Pl.'s Ex. 17. Thus Plaintiff has shown that an issue of fact exists as to whether Defendants' manufactured cigarettes are distinct from raw tobacco.

## 2. Whether Defendants' Cigarettes are not Unreasonably Dangerous Because the Dangers of Smoking Are and Always have been Commonly Known

Defendants next argue that Plaintiff's products liability claims fail as a matter of law because the health risks of cigarettes have been commonly known by ordinary consumers throughout Mr. Little's lifetime. The Fourth Circuit interpreting comment i to Section 402A has asserted that "whether the defect causes the product to be 'unreasonably dangerous' is measured by the 'ordinary consumer' for whom the product is designed." *Vaughn,* 77 F.3d at 738. A product cannot be labeled either defective or unreasonably dangerous "if a danger associated with the product is one that the product's users generally recognize." *Anderson v. Green Bull, Inc.,* 322 S.C. 268, 471 S.E.2d 708, 710 (1996) (citations omitted). Furthermore, the test for whether a product is unreasonably dangerous to an ordinary consumer is a "purely objective determination." *Vaughn,* 77 F.3d at 738.

Applying the common knowledge test in the context of tobacco litigation has been a challenge for many courts.[8] How-

---

7. Notably, the Restatement (Third) of Torts § 2, comment d (1998), which most closely parallels Section 402A, excludes tobacco from its list of "common and widely distributed products" which may inherently pose substantial risks of harm, therefore the comment adopts the "prevailing view that, except in extreme cases, and putting aside the special case of cigarettes, the courts have no business legislating the overall desirability of necessarily dangerous but widely-consumed products." David Owen, *Products Liability Law Restated,* 49 S.C. L.Rev. 273, 291 (1998) (footnotes omitted).

8. Not surprisingly, the courts are splintered on the application of the rule depending upon the jurisdiction and the specific facts of the case. As of 1999, seventeen jurisdictions adhered to the consumer knowledge rule, nineteen repudiated it, and sixteen had not addressed the issue. *Hill v. R.J. Reynolds Tobacco Co.,* 44 F.Supp.2d 837, 841 (W.D.Ky. 1999). The court will not attempt a chronology or categorization of all the cases as that can be readily found in other opinions. *See Guilbeault v. R.J. Reynolds Tobacco Co.,* 84 F.Supp.2d 263 (D.R.I.2000).

ever, the key to reaching the correct result is to properly frame the issue. The Sixth Circuit Court of Appeals in *Tompkin v. American Brands,* 219 F.3d 566 (6th Cir. 2000), stated the following:

> The pertinent issue here is not whether the public knew that smoking was hazardous to health at some undifferentiated level, but whether it knew of the specific linkages between smoking and lung cancer. Public awareness of a broad-based and ambiguous risk that smoking might be tenuously connected to lung cancer does not suggest "common knowledge" of the known scientific fact that cigarette smoking is a strong precipitant of lung cancer.

*Id.* at 572 (citing with approval *Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515, 1526 (D.Kan.1995)). The court agrees with the Sixth Circuit that "the 'common knowledge' requirement is emasculated if a defendant may show merely that the public was aware that a product presented health risks at some vague, unspecified, and undifferentiated level." *Id.*

■■ With that focus the court will examine the issue as it pertains to the case at bar. The parties agree that whether a product is unreasonably dangerous to an ordinary consumer is purely an objective determination. The court concludes, therefore, that Mr. Little's knowledge or lack of knowledge concerning the dangers of cigarettes is irrelevant for purposes of this analysis.[9] It is the Plaintiff's position that the "ordinary consumer" did not at the times in question-and perhaps still-comprehend the extent of dangers posed by cigarettes, and more specifically the extent that these dangers will actually affect that person. Plaintiff points to the following sample of authorities: (1) Matthew L. Myers, et al., *Staff Report on the Cigarette Advertising Investigation (Public Version),* May 1981; (2) Howard Leventhal, Ph.D., et al., *Is the Smoking Decision an 'Informed Choice'? Effect of Smoking Risk Factors on Smoking Beliefs;* JAMA 1987; 257:3373–3376; (3) William M. London, Ed.D., M.P.H., et al., *Cigarettes: What the Warning Label Doesn't Tell You, The First Comprehensive Guide to the Health Consequences of Smoking,* American Council on Science and Health (New York 1996); (4) Michael Schoenbaum, Ph.D., *Do Smokers Understand the Mortality Effects of Smoking? Evidence from the Health and Retirement Survey;* American Journal of Public Health, 1997, 87:755–759; (5) Lydia Saad, et al., *The Tobacco Industry Summons Polls to the Witness Stand: A Review of Public Opinion on the Risks of Smoking,* The Gallup Organization, May 15, 1998. *See* Pl.'s Mem. in Opp. at 23–25.

Plaintiff claims that this evidence demonstrates that there are clearly jury questions as to (1) what was the ordinary, common knowledge of the community when Martin Little smoked the Defendants' cigarettes, and (2) whether the cigarettes were dangerous to an extent beyond that which would be contemplated by the ordinary consumer. Plaintiff also argues that the Defendants are disingenuous in their position that the dangers of cigarette smoking were commonly known to the community when, during and after the time that Martin Little smoked cigarettes, the Defendants were vigorously proclaiming that the dangers had not been established.

---

**9.** While acknowledging that the test of whether a product is unreasonably dangerous to the "ordinary consumer" is a purely objective determination, Defendants nonetheless recite Mr. Little's subjective knowledge in support of their argument. As previously determined, that knowledge may be relevant to other issues in this case, but it is not relevant to the determination here.

The Defendants on the other hand contend that throughout Mr. Little's lifetime ordinary consumers in South Carolina and across the country, have been well aware of the perceived health risks associated with smoking-including claims that smoking causes cancer and claims of its "addictive" nature.[10] The Defendants claim all of these matters were well covered in the popular press,[11] and specifically the release of the Surgeon General's Report on Smoking and Health in 1964, which concluded that smoking causes lung cancer. Further, the Defendants rely on several cases

which have concluded that the health risks of smoking have been commonly known.[12]

This case, perhaps more than others, presents a close call on the issue of "common knowledge" because Mr. Little's smoking experience extended from 1961 through 1995. Undoubtedly, there is a point within that time frame wherein all of the health risks associated with cigarette smoking became common knowledge. On the other hand, there are strong arguments that during some portion of that time the same dangers and risks were not common knowledge.[13] The existence of

---

**10.** Def. Reynolds' Mem. at 18–20. The Defendants contend that the health hazards of cigarette smoking have been disseminated widely in the popular culture for the past 100 years in every imaginable form. For example, the Defendants cite King James I describing smoking as "a custom loathesome to the eye, hateful to the nose, harmful to the brain, [and] dangerous to the lungs." James I, *Counterblaste to Tobacco* (London 1604), *reprinted by* the DaCapo Press (New York 1969). Defendants also point to a United States Supreme Court case in 1900 stating that belief in cigarettes' deleterious effects has become very general, *Austin v. Tennessee*, 179 U.S. 343, 348, 21 S.Ct. 132, 45 L.Ed. 224 (1900), a 1912 National Health Education Study reporting that ninety-five (95%) percent of public schools in the United States provided instruction about harmful effects of smoking, and expert testimony of Lacy K. Ford, Ph.D. that at least since the 1920's smoking and health issues were taught in South Carolina schools and classrooms throughout the country. Further, Defendants cite textbooks and materials prepared by state education departments, including information on health effects of smoking, and claim that by 1921 fourteen states had banned the production or sale of tobacco. *See* Paul G. Crist and John M. Majoras, *"The New" Wave in Smoking and Health Litigation—Is Anything Really So New?* 54 Tenn. L.Rev. 551, 555, 556 and Note 34 (1987).

**11.** Defendants emphasize that, by the time the Surgeon General convened an advisory committee to examine the issue of health hazards of smoking in 1962, there were more than 7,000 publications on the subject. *See Cipol-*

*lone v. Liggett Group, Inc.*, 505 U.S. 504, 513, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

**12.** Def. Reynolds' Mem. at 20–22. Defendants also rely on *Estate of White v. R.J. Reynolds Tobacco Co.*, 109 F.Supp.2d 424 (D.Md. 2000), where the Maryland District Court held that the plaintiff's strict liability claim failed because the dangers of smoking were commonly known since the 1950's. *Id.* at 431–33. However, this case is distinguishable from the one before this court because in *White* the plaintiff failed to offer enough evidence to contradict the defendants' assertion that the dangers of smoking were commonly known. *Id.* 432–33. On the other hand, Plaintiff in this case has clearly forecasted enough evidence to create a genuine issue of fact sufficient to survive summary judgment.

**13.** Treatment of this issue in the Sixth Circuit illustrates these propositions. In *Roysdon v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230 (6th Cir.1988), the Sixth Circuit stated that cigarettes are not "unreasonably dangerous" in light of the extensive information regarding the risks of smoking which was available to the public during the relevant time in the case which was limited from 1974 to 1984. The Sixth Circuit in a more recent case reached the opposite conclusion in the case of a smoker who used tobacco products from 1950 to 1965. *Tompkin v. American Brands*, 219 F.3d 566 (6th Cir.2000). The court held that a genuine issue of material fact exists as to the extent of "contemporaneous common knowledge" on the link between cigarette smoking and lung cancer. *Id.* at 575.

such arguments demonstrates why this court believes the determination is better left to the collective wisdom and experience of a jury. The court is buttressed in this view by the fact that the United States Congress may have implicitly recognized that the link between smoking and lung cancer was not "common knowledge" when it enacted the 1966 Labeling Act and its successive amendments in 1969 and 1984. The Labeling Act created a "comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health" and was explicitly designed to ensure that "the public may be adequately informed that cigarette smoking may be hazardous to your health." Pub.L. 89–92, § 2, 79 Stat. 282 (codified at 15 U.S.C. § 1331). As the Sixth Circuit has noted:

> It was not until the 1984 amendments to the Labeling Act that Congress finally required cigarette packages to warn that smoking causes lung cancer, ... Given that the Labeling Act was expressly designed to "adequately inform" the public of the dangers of cigarette smoking, the Act implies that prior to its 1966 enactment a substantial portion of the public was underinformed as to the specific dangers posed by smoking.

*Tompkin,* 219 F.3d at 573. Furthermore, it was not until 1988 that the Surgeon General published a report informing of the addictive nature of cigarettes.[14] Yet on April 14, 1994, the chief executive officers of the major tobacco manufacturers testified before Congress that nicotine is not addictive.[15] This again highlights the difficulty for the court in judicially noticing what the common knowledge of the ordinary cigarette smoker may have been at any given time.

This court declines to set the bar but it will cap the height to which it may be raised. The court concludes that by 1988 all the risks associated with cigarette smoking were known to the ordinary consumer with ordinary knowledge common to the community.[16] The jury in this case will be allowed through specific interrogatories to set the bar at any year before 1988.

### 3. Safe and Alternative Design

■ Defendants further contend that South Carolina law in product liability cases requires proof of the existence of a safer and feasible alternative design. *See Cohen v. Winnebago Indus., Inc.,* 210 F.3d 360, 2000 WL 299459, at *4 (4th Cir.2000) (citing *Bragg v. Hi–Ranger, Inc.,* 319 S.C. 531, 462 S.E.2d 321 (1995)). Defendants argue that Plaintiff's negligence and strict liability claims fail because she cannot meet her burden to prove a safer and feasible alternative design for cigarettes. Defendants point primarily to the deposition testimony of Plaintiff's expert Dr.

---

14. *Rogers v. R.J. Reynolds Tobacco Co., Inc.,* 557 N.E.2d 1045, 1054 (Ind.Ct.App.1990).

15. *Castano v. The American Tobacco Co.,* 870 F.Supp. 1425, 1433 (E.D.La.1994).

16. The court notes that in *F.D.A. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), the United States Supreme Court stated that when Congress enacted legislation regarding smoking and health on six different occasions since 1965, "the adverse health consequences of tobacco use were well known, as were nico-

tine's pharmacological effects." *Id.* at 1302. The court notes that this statement, made by Justice O'Connor writing for a 5–4 majority, was made in the context of establishing that Congress intended to foreclose a ban of tobacco and thus foreclose FDA regulation of tobacco. The statement was not made in the product liability context of determining the very specific issue of whether the dangers of smoking were commonly known by ordinary consumers throughout Mr. Little's lifetime. Therefore, the court finds that the above-quoted statement by the Supreme Court has no bearing on the issue at hand.

William Farone regarding his conception of an inhalant product which would deliver a drug like nicotine as an alternative to cigarettes as constituting Plaintiff's proof concerning a safer alternative design. Defendants suggests that Dr. Farone's hypothetical inhalant product clearly fails to qualify as a safer and feasible alternative to cigarettes.

Plaintiff responds by first arguing that proof of a safer alternative design is not a per se element of her product liability case, but instead merely a factor to be considered in the risk-utility analysis. Plaintiff contends that *Cohen* overstates South Carolina law regarding the requirement of proof of a safer and feasible alternative design. Furthermore, Plaintiff argues that she will nonetheless introduce evidence establishing feasible design alternatives in addition to the testimony identified by Defendants above.[17]

South Carolina courts have not explicitly decided whether showing a safer alternative design is a per se element in a product liability case. Nonetheless, the Fourth Circuit in its unpublished decision in *Cohen* stated that "providing evidence of the existence of an alternative safer, feasible design is part of the plaintiff's products liability case under South Carolina law . . . ." 210 F.3d 360, 2000 WL 299459, at *4 (citing *Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 462 S.E.2d 321 (1995)). It is clear that in *Bragg* the South Carolina Court of Appeals did, in part, focus on the plaintiff's failure to introduce evidence of a feasible design alternative in upholding the trial court's granting of summary judgment. 462 S.E.2d at 330. However, the court never stated that producing evidence of a feasible alternative was an element of the

plaintiff's action. The plaintiff's failure to show an alternative design was coupled with his failure to show the product was defective at the time it was sold. *Id.* at 327–30.

■ Nonetheless, while there is no explicit statement including proof of a safer alternative design as an element of a product liability case, clearly South Carolina courts have found that failure to provide such proof can doom a case as a matter of law. *See Sunvillas Homeowners Assoc. v. Square D Co.*, 301 S.C. 330, 391 S.E.2d 868, 870 (1990) (noting, while upholding the trial court's grant of summary judgment in favor of the defendant, that the plaintiff failed to offer any evidence of an alternative design); *Gasque v. Heublein, Inc.*, 281 S.C. 278, 315 S.E.2d 556, 559 (1984) (holding that the issue of negligent design was properly submitted to the jury where plaintiff introduced expert testimony that a feasible, safer alternative design existed and two company reports of the defendant which stated that a safer alternative design existed). Thus, the existence of a safer alternative design is a crucial aspect of a product liability case in South Carolina.

This conclusion is unaffected by Plaintiff's reliance on *Claytor v. General Motors Corp.*, 277 S.C. 259, 286 S.E.2d 129 (1982), as support for her argument that a safer alternative design is merely a factor to be weighed in determining whether the product is in a defective condition and unreasonably dangerous. In *Claytor*, the South Carolina Supreme Court stated:

> Academically, it may be argued that all products are defective because they can be made more safe. However, it does

---

**17.** Plaintiff will also seek to introduce evidence regarding Reynolds' concern about its legal position as it affected the pursuit of safer alternative designs and that Reynolds now provides what it describes as a safer alternative to regular cigarettes. The court need not address the proffered evidence and its attendant arguments in resolving this particular issue.

not automatically follow that the products are deemed "unreasonably dangerous." In the final analysis, we have another of the law's balancing acts and numerous factors must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger.

*Id.* at 132; *see also Reed v. Tiffin Motor Homes, Inc.,* 697 F.2d 1192, 1197 (4th Cir. 1982) (stating "it is clear that South Carolina does balance the utility of the risk inherent in the design of the product with the magnitude of the risk" and recognizing the list of factors announced in *Claytor*). Even if this court were to find that the existence of a safer alternative design was merely one such factor, the court could not ignore the treatment by South Carolina courts of the failure to provide evidence of

a safer alternative design as fatal to a product liability case. Thus, whether the requirement that evidence of a safer alternative design is characterized as an element of Plaintiff's products liability case or a factor to be weighed in the risk-utility analysis, it is clear the South Carolina law requires that Plaintiff provide such evidence in order to survive summary judgment.[18]

Plaintiff has clearly demonstrated that she will not solely rely, as Defendants have suggested, on Dr. Farone's conception of an inhaler device as an alternative design for cigarettes. Instead, Plaintiff has provided an affidavit by Dr. Farone suggesting numerous technologies which in his opinion could have been utilized by Defendants to provide a safer cigarette since the early 1960's at the latest. Farone Aff. at ¶¶ 4–7.[19] These alternatives are in addition to the inhaler product suggested by

---

18. The court in *Cohen* cogently noted the following:

> Appellants argue that *Bragg* does not make evidence of design alternatives an additional element of the appellants' case; instead, they argue, *Bragg* merely stands for the proposition that such evidence must be offered in order for the case to go to the jury. The appellants' argument fails because they do not explain how it is possible that failure to introduce evidence on a certain issue dooms a case as a matter of law, but how an instruction that such evidence is required is erroneous. The clear import of *Bragg* is that, under South Carolina law, evidence of an alternative design is required . . . .

*Cohen,* 210 F.3d 360, 2000 WL 299459, at *5.

19. Dr. Farone's list of possible safer alternatives deals with three areas: (1) tobacco growing; (2) tobacco processing; and (3) filter technologies. As for tobacco growing, Dr. Farone suggests that Reynolds could have: (1) used tobacco grown with nitrate-free fertilizers; (2) used tobacco grown with fertilizers screened for radioactive isotopes; (3) used air-cured Bright tobacco in place of flue-cured Burley tobacco; (4) used tobacco free

of tobacco-specific nitrosamines; (5) used tobacco strains high in cellulose; (6) used tobacco strains in which the only alkaloid is nicotine; and (7) used strains of tobacco that do not concentrate or collect nitrates or heavy metals. Farone Aff. at ¶ 4. He claims that genetic modification of tobacco was widely available by the early 1970's. *Id.* at ¶ 8.

Dr. Farone opines that Reynolds could have done the following in regards to its tobacco processing: (1) extracted all alkaloids and removed tobacco-specific nitrosamines and nitrates coupled with the reintroduction of purified nicotine; (2) eliminated additives such as those containing nitrogen; (3) used more expanded tobacco; and (4) decreased use of reconstituted tobacco. *Id.* at ¶ 5. The technology to extract nitrates and nitrosamines was available from the mid–1950's. *Id.* at ¶ 9. Finally, Dr. Farone suggests the following filter technologies were available and would have provided a safer alternative: (1) use of charcoal filters; (2) use of additional, selective filters; (3) use of longer filters; (4) use of more efficient filters; and (5) use of ventilation at the tobacco end of filters. *Id.* at ¶ 6. He states that filter technology was highly developed by the late 1940's and early 1950's. *Id.* at ¶ 9.

Dr. Farone in his deposition testimony.[20] This affidavit suggests that Plaintiff will introduce evidence of safer alternative designs and thus, Plaintiff has raised a question of fact sufficient to survive summary judgment.[21]

## C. Whether Plaintiff May Maintain her Pre–1969 Failure to Warn Claims Against Reynolds [22]

 Reynolds argues that Plaintiff cannot maintain her pre–1969 failure to warn claims because, as argued above, the hazards of smoking were commonly known throughout Mr. Little's lifetime. Under South Carolina law, a manufacturer is not required to warn of a product's dangers if those dangers are obvious and commonly known to consumers. *See Claytor v. General Motors Corp.*, 277 S.C. 259, 286 S.E.2d 129, 132 (1982); *Anderson v. Green Bull, Inc.*, 322 S.C. 268, 471 S.E.2d 708, 710 (1996). However, as stated above, the court finds that what is commonly known about the hazards of smoking and when it became so are questions for the jury. Thus, the court cannot grant summary judgment in favor of Reynolds on this ground until the jury has determined when the hazards of smoking became commonly known.

Reynolds further argues that Plaintiff cannot prove that Reynolds, by not warning of the hazards prior to 1969, caused Mr. Little's cancer. Reynolds contends that Plaintiff must show that the eight years of smoking between 1961 and 1969 was the proximate cause of Mr. Little's lung cancer. *See Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 275

(D.R.I.2000). Plaintiff responds by noting that she will offer expert opinions that cigarette smoke caused Mr. Little's lung cancer. Further, the eight years Mr. Little smoked Reynolds' cigarettes constituted approximately 25% of Mr. Little's smoking history and that by starting at an early age, Mr. Little's mortality rate was almost twice that of a man who began smoking at age twenty, *Report of the Surgeon General 1982*, p. 39, Table 7. Whether 25% of Mr. Little's smoking history could constitute a proximate cause of his cancer is a question for the jury.

 However, Reynolds further argues the Plaintiff must show that a warning from Reynolds prior to 1969 would have caused Mr. Little to stop smoking. *See Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F.Supp.2d 263, 275 (D.R.I.2000). The South Carolina Court of Appeals has stated that "[t]he plaintiff has the burden of showing that a warning would have made a difference in the conduct of the person warned." *Allen v. Long Mfg. NC, Inc.*, 332 S.C. 422, 505 S.E.2d 354, 359 (1998).

The Plaintiff has offered no evidence that Mr. Little would never have begun smoking or stopped smoking had Reynolds provided a pre–1969 warning. Instead, Plaintiff merely asserts that such proof is not required under South Carolina law. However, *Allen* clearly contradicts the Plaintiff's assertion. Therefore, summary judgment is granted in favor of Reynolds as to the pre–1969 failure to warn claims.

---

20. Because Plaintiff is not relying solely on the inhaler product as a safer alternative design, the court need not address at this time Reynolds' argument that such a device is not a feasible alternative design at all.

21. Plaintiff also suggests the proposed areas to be covered by her expert Dr. Henningfield

will provide evidence of safer alternatives. *See* Pl.'s Mem. in Opp. at 27 n. 25.

22. These pre–1969 claims cannot be asserted against B & W because Mr. Little did not begin smoking B & W cigarettes until sometime during the 1970's.

**D. Whether B & W is Entitled to Summary Judgment, in its Individual Capacity, as the Manufacturer of Barclay Cigarettes**

▉▉▉▉ As stated *supra*, under Plaintiff's product liability claims, she must establish that the product defect proximately caused Mr. Little's injuries. *See Small v. Pioneer Machinery, Inc.*, 329 S.C. 448, 494 S.E.2d 835, 842 (1997). Under South Carolina law, "[p]roximate cause requires proof of (1) causation in fact and (2) legal cause." *Bramlette v. Charter–Medical–Columbia*, 302 S.C. 68, 393 S.E.2d 914, 916 (1990) (citing W. Keeton, *Prosser and Keeton on the Law of Torts*, §§ 41–42 (5th ed.1984)); *Accordini v. Security Central, Inc.*, 283 S.C. 16, 320 S.E.2d 713 (1984).[23] Typically, a plaintiff may prove causation in fact by establishing that the injury would not have occurred "but for" the defendant's negligence. *Id.* (citing *Hanselmann v. McCardle*, 275 S.C. 46, 267 S.E.2d 531 (1980); *Hughes v. Children's Clinic, P.A.*, 269 S.C. 389, 237 S.E.2d 753 (1977)). However,

> [w]here several causes combine to produce injury, a person is not relieved from liability for negligence because he is responsible for only one of them. It is sufficient that his negligence is an efficient cause without which the injury would not have resulted to as great an extent and that any other efficient cause is not attributable to the person injured.... Consequently, if a person's negligence is a proximate cause of an injury to another, the fact that the negligence of a third party concurred with his own negligence to produce the harm does not relieve him of liability.... In such cases, both tortfeasors are in breach of a duty of care owed to the plaintiff and, because the negligence of

both concurred to produce the injury, both are liable to the full extent of the plaintiff's damages.

*South Carolina Ins. Co. v. James C. Greene and Co.*, 290 S.C. 171, 348 S.E.2d 617, 620 (1986) (citing *Gray v. Barnes*, 244 S.C. 454, 137 S.E.2d 594 (1964); *Brown v. National Oil Company*, 233 S.C. 345, 105 S.E.2d 81 (1958)); *see also Small*, 494 S.E.2d at 843 (asserting that "proximate cause does not mean the sole cause"); Def. B & W's Mem. at 9 (quoting same as standard of causation where plaintiff alleges that multiple defendants caused injury). Alternatively, as stated in *Prosser & Keeton on the Law of Torts*:

> When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event.

W. Keeton, *Prosser & Keeton on the Law of Torts* § 41, at 268 (5th ed.1984).

▉▉▉▉ Thus, under South Carolina law, "the defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." *Small*, 494 S.E.2d at 843. In addition, a plaintiff under this rule must show

> that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

---

**23.** The second prong of proximate cause, legal cause, which is proved by establishing foreseeability, is not at issue at this juncture.

*Fitzgerald v. Manning,* 679 F.2d 341, 348 (4th Cir.1982); *see also McCarty v. Kendall Co.,* 238 S.C. 493, 120 S.E.2d 860, 863 (1961) (ruling that causation was established where a doctor testified that immobilization was a "contributing factor to a large degree" to the plaintiff's development of kidney stones); Restatement (Second) of Torts § 431 ("The actor's negligent conduct is a legal cause of harm to another if . . . his conduct is a substantial factor in bringing about the harm.").

▮ In this case, B & W contends that, as a matter of law, Plaintiff cannot establish that Mr. Little's smoking of B & W's Barclay cigarettes substantially contributed to his lung cancer, as Mr. Little smoked Barclay for merely several months during his thirty-four-year smoking history. Indeed, Plaintiff concedes that Mr. Little admitted that he smoked Barclay regularly for a period of months as opposed to years, although he could not quantify the number of months. Plaintiff's Mem. in Opp. at 7 (citing M. Little Dep. 10/26/98 at 114,. 132).[24] Plaintiff additionally notes, however, that Mr. Little testified that when he switched cigarette brands to the allegedly lower-tar and lower-nicotine Barclay cigarettes as part of his efforts to gradually quit smoking, he increased the number of cigarettes he smoked. *Id.* (citing M. Little Dep. 10/26/98 at 133–34; M. Little Dep. 2/24/99 at 53). Plaintiffs further point out that after becoming a regular Carlton smoker, for approximately fifteen to twenty years he continued to buy and smoke Barclay when he could not find Carlton at the store, until he finally quit smoking in 1995. *Id.* (citing M. Little Dep. 3/22/99 at 90; M. Little Dep. 2/24/99 at 48–49).

According to Plaintiff's expert Dr. Burns, Barclay contributed less than one percent of the dosage of tobacco smoke to which Mr. Little was exposed over his thirty-four-year smoking history. Burns Dep. at 312 ("Q: So would it be fair to say then, that assuming he smoked Barclay for a matter of months . . . [t]hen in terms of his the contribution to his clinical course the Barclays would have been less than one percent? A: In terms of the contribution to the dose of tobacco smoke he received, it would be less than one percent."). Dr. Burns testified that this percentage of exposure "is unlikely to have influenced the occurrence of the lung cancer in a meaningful way . . . . That contribution is small and is in general not one that we would have felt to be substantive clinically." Burns Dep. at 310.[25]

Plaintiff's expert Dr. Hammar testified that Mr. Little's smoking of Barclay for a period of months did not substantially increase his risk of contracting lung cancer, and that he could not opine that it is more likely than not that smoking Barclay contributed to any of the cell mutations that caused Mr. Little's cancer. Hammar Dep. at 208–09. Dr. Hammar testified that:

[a]ll I'd say is that all carcinogens contribute to the development of cancer. When you're talking about a multi-stage process of carcinogenesis, it's that any exposure to that carcinogen I think potentially contributes. Now, how much it contributes is very difficult to say. Obviously, if you compare six months of Barclay versus the other cigarette smoking he had, it's a very minimal exposure; but you never know, though, that maybe

---

24. The court concludes that a jury could reasonably find that Mr. Little smoked Barclay for anywhere between one and eleven months.

25. In light of this testimony, the court does not give much weight to Dr. Burns's testimony by way of subsequent affidavit that "[b]ecause lung cancer is a cumulative injury, every dose of cigarette smoke exposure contribute[d] to the lung cancer disease process," including the Barclay cigarettes that Mr. Little smoked. Burns Aff. at ¶¶ 8, 9.

that was the key one that did the final mutations that made a cell change.

Hammar Dep. at 209. It is therefore clear that, due to the cumulative multi-stage process of lung cancer, Mr. Little's smoking of Barclay cigarettes contributed to his lung disease. However, none of Plaintiff's experts opined that such contribution was substantial, and the court finds that the one percent contribution was *de minimis*. *See Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1163 (4th Cir.1986) (applying in the context of the lengthy asbestosis disease process, a *de minimis* rule requiring a plaintiff "to prove more than a casual or minimum contact with the product"); *see also Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000, 1010 (1990) (in an action against a private school and food service, the court found that no reasonable juror could conclude by a preponderance of the evidence that the school, which served only one percent of students' meals, was responsible for the student's development of salmonella). This court holds that Mr. Little's smoking of Barclay was not an efficient cause without which his injury would not have resulted to as great an extent. The court therefore grants B & W's motion for summary judg-

ment on Plaintiff's claims against it in its individual capacity, as the manufacturer of Barclay cigarettes.[26]

**E. Whether B & W is Entitled to Summary Judgment, in its Individual Capacity, as the Manufacturer of Carlton Cigarettes**

B & W also contends that it is entitled to summary judgment in its individual capacity as the manufacturer of Carlton cigarettes.[27] B & W points out that Mr. Little's cancer has been identified on the June 2, 1993 x-ray, nearly two years before Carlton cigarettes, as manufactured by B & W, were available for purchase. Furthermore, B & W asserts that Mr. Little testified that he quit smoking in December 1995, only nine months after B & W's merger with American, and that his exposure to B & W's Carlton cigarettes was thus *de minimis*. Plaintiff did not respond to these arguments. In light of the foregoing, the court grants B & W summary judgment in its individual capacity as the manufacturer of Carlton cigarettes.

**F. Whether Plaintiff May Maintain her Breach of Implied Warranty Claims Against B & W**[28]

Under South Carolina law, "a

---

26. The court notes, in reaching this conclusion, that it has not considered Dr. Burns's testimony, in both his deposition and affidavit, that Barclay's advertisements interfered with Mr. Little's ability to quit. Such testimony from Dr. Burns is outside his area of expertise, and his speculative conclusions by way of affidavit do not satisfy Federal Rule of Civil Procedure 56(e)'s requirements that an affidavit be made on "personal knowledge," "set forth such facts as would be admissible in evidence," and "show affirmatively that the affiant is competent to testify to the matters stated therein." *See Joy*, No. 96–2645–CIV–T–24(B), at 7 (finding that Plaintiff's assertions in his affidavit that one of the reasons the decedent continued to smoke was her reliance upon the defendant tobacco company's advertisements "would seemingly be either speculation (he assumed her state of

mind) or hearsay (she told him of her reliance on advertisements)").

27. The American Tobacco Company ("American") designed, manufactured, and sold Carlton cigarettes from 1963 until February 26, 1995, when it merged with B & W. After the merger, American ceased to exist, and B & W became its successor by merger. B & W alleges that it did not begin manufacturing Carlton cigarettes until after the date of the merger, and its Carlton cigarettes did not enter the stream of commerce until several months later.

28. Since the court has granted summary judgment in favor of B & W individually, *see supra* Sections D & E, any references to B & W in this order from this point on refer to B & W as successor to American Tobacco.

warranty of merchantability is implied in a contract for the sale of goods if the seller is a merchant with respect to goods of that kind." *Doty v. Parkway Homes*, 295 S.C. 368, 368 S.E.2d 670, 671 (1988) (citing S.C.Code Ann. § 36–2–314(1) (Law.Co-op.1976)). In order to prove a breach of such implied warranty, a plaintiff must prove that "the product was not reasonably fit or safe for its intended use." *Livingston v. Noland Corp.*, 293 S.C. 521, 362 S.E.2d 16, 18 (1987); *Claytor v. General Motors Corp.*, 277 S.C. 259, 286 S.E.2d 129, 132 (1982) (same); *Doty*, 368 S.E.2d at 671 (asserting that "[g]oods to be merchantable must be fit for the ordinary purposes for which such goods are used.") (citing S.C.Code Ann. § 36–2–314(2)(c) (1976)). "It is sufficient if the plaintiff presents evidence from which it can be reasonably inferred that the goods were defective at the time the sale was completed," *id.*, and that such defect "was the direct and efficient cause of plaintiff's injury," *Livingston*, 362 S.E.2d at 18 (citing *Benford v. Berkeley Heating Co.*, 258 S.C. 357, 188 S.E.2d 841 (S.C.1972); *Madden v. Cox*, 284 S.C. 574, 328 S.E.2d 108 (1985)). Furthermore, a plaintiff may use circumstantial evidence to establish a breach of implied warranty. *Doty*, 368 S.E.2d at 671 (citing *Cohen v. Allendale Coca–Cola Bottling Co.*, 291 S.C. 35, 351 S.E.2d 897 (1986)).

Here, Plaintiff alleges in her Second Amended Complaint that "Defendants' cigarettes were defective because when smoked by Martin Little as intended, they delivered higher and more dangerous levels of tar and nicotine than Defendants implied and Martin Little reasonably believed." Second Am. Compl. at ¶ 37. Mr. Little's intended use of Carlton cigarettes was to smoke a healthier cigarette and to use the lower tar and nicotine cigarettes as a stepping stone towards quitting. M. Little Dep. 10/26/98 at 124–25; *see also* M. Little Dep. 2/24/99 at 51; Def. B & W's

Mem. at 3. B & W maintains that since the ordinary use of cigarettes is to smoke them, Plaintiff's intended use of its cigarettes as a healthy alternative transforms the implied warranty of merchantability claim into a claim for breach of the implied warranty of fitness for a particular purpose. Regarding the latter claim, South Carolina Code Ann. § 36–2–315 (1976) states:

> [w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose.

*Id.; see Hite v. Ed Smith Lumber Mill, Inc.*, 309 S.C. 185, 420 S.E.2d 860, 862 (1992) (citing same). As South Carolina's highest court has recognized, the Uniform Commercial Code "tends to overlap the warranty of merchantability with that of fitness for [a particular] purpose." *Soaper v. Hope Industries, Inc.*, 309 S.C. 438, 424 S.E.2d 493, 495 (1992) (citing Hawkland, *A Transactional Guide to the Uniform Commercial Code*, § 1.19020702 at 68 (1964)). At this stage, it is immaterial under which warranty claim Plaintiff is proceeding, as B & W was aware that its customers bought its as-advertised lower tar and nicotine cigarettes for the purpose of smoking a safer and healthier cigarette. Expert witness Eric Gesell testified as follows:

> Q: Do you think a reasonable person could reach that conclusion by looking at these [Carlton] ads that less tar means less risk, means less hazardous?
>
> A: Sure.
>
> . . . . .
>
> Q: Do you believe that Carlton's copy strategy in the mid 1970's attempted to appeal to smokers who were concerned

with the health hazards of cigarettes smoking?

A: People who were interested in less tar, so, therefore, sure, they may have felt that this would be a better cigarette for them to smoke.

Gesell Dep. at 141, 159. Plaintiff points out that B & W was not only aware of its consumers' health concerns, it considered smoking cessation devices a threat to profits and sought to intervene in that market:

In light of the recent smoke-cessation craze, we may want to consider a drug store specific sales initiative built around Carlton—*a brand which may appeal to a potential patch user* .... A recent *USA Today* article indicated $600 million in prescription patches will be filled in 1992. This amount is expected to reach $1 billion by 1995. *This is obviously a threat to our customer base* which we need to defend against.

The American Tobacco Company, Field Sales Weekly Re–Cap, Pl.'s Ex. 17 (emphasis added). Under these facts, it is clear that B & W knew that customers who bought its lower tar and nicotine cigarettes were looking to smoke a healthier cigarette. Mr. Little, by purchasing such cigarettes, impliedly made known to B & W that his particular purpose for the cigarettes was to smoke a healthier cigarette, *see Soaper,* 424 S.E.2d at 495 (holding that the plaintiff, upon purchasing defendant's film processor for use in his fast photo business, impliedly gave notice to the defendant that his particular purpose for the machine was fast film developing), and B & W's conclusory argument to the contrary is unconvincing, as is any argument that B & W did not know that Mr. Little was relying on its skill or judgment to furnish a "healthier" cigarette. Viewing the evidence in the light most favorable to Plaintiff, Mr. Little used Carlton cigarettes as a safer alternative, and B & W was aware of this.

Plaintiff further contends that B & W breached the implied warranty because its product did not deliver a less hazardous cigarette. While B & W points out that Carlton delivered lower tar and nicotine than other cigarettes, Plaintiff maintains that Carlton cigarettes were defective because their ventilation design made it easy for a user, by simply covering the ventilation holes while smoking, to alter the tar and nicotine delivery without knowing the health consequences. In support of this position, Plaintiff cites the testimony of her expert Jack Henningfield:

And so the idea that ventilation, for example, can be a good thing does not hold true if the means of accomplishing the ventilation is done in a way that people can easily cover the ventilation and defeat it as Martin Little was able to do ... for it to work it means in practice it should work in people and not just in [FTC testing] machine[s].

Pl.'s Mem. in Opp. at 13 (citing Henningfield Dep. at 219). Plaintiff also cites the following testimony of Dr. Burns:

Q: When Carlton cigarettes were invented and their designs were refined early on in the late-'60s through the mid-'70s, do you contend that the people who were designing those cigarettes were designing the cigarette with an intent to provide the smoker with a higher delivery than the FTC machine would record?

A: It is my belief, from my review of tobacco industry documents, that the design characteristics of the cigarettes that were being sought were ones where the yield of the cigarette would change substantially with different characteristics of the smoking pattern, that that was set and was set by design such that when the machine smoking parameters were used, a very low level of tar would be generated, but that when the smoker smoked those cigarettes, they would de-

rive from that cigarette, based on the elasticity of yield that had been designed into those cigarettes, the flavor sufficient for them to derive satisfaction from that cigarette, and that ... those were the goals that were expressed in the design characteristics.

I don't think that the engineers expressed a design goal to lie to anyone. What they expressed a design goal to do was to produce a cigarette that had a very low measurement under the circumstances used by the machine, but would have a very much higher delivery when used by people so that that cigarette would satisfy the craving or the needs of that individual.

Pl.'s Mem. in Opp. at 14 (citing Burns Dep. at 188–89).

B & W's argument is that Mr. Little misused Carlton cigarettes by covering the ventilation holes and thus in part caused his lung cancer.[29] Plaintiff's argument is that the design of Carlton cigarettes intentionally made it easy for users to alter the tar and nicotine delivery. Moreover, B & W's expert testified that B & W knew that its customers were consciously blocking the filter's ventilation holes, without knowledge of the corresponding health risks, in order to get a more full-flavored taste from the low-tar cigarette:

Q: You think that people covered up the holes in the filter knew what they were doing and why they were doing it?
A: They knew they were making the cigarette a stronger taste, sure.
Q: Do you think they knew the health effects and consequences of what they were doing?
A: Oh, I can't answer that. I know that they knew they were making it a stronger cigarette.

Gesell Dep. at 137. Mr. Little testified that he did not understand the health consequences to his ventilation blocking, but rather knew only that he was getting a fuller taste:

Q: Now, the first time you smoked a Carlton did you see the holes and block it the very first time?
A: No, I don't think I did because I remember smoking them and getting nothing.
Q: Okay, well, by nothing you mean very dilute[d] smoke?
A: Yeah ... I guess that is the way.
Q: Okay. So you understood then that if you blocked the holes you would get more smoke, correct?
A: That's correct.
Q: And did you understand that if you blocked the holes you would get more nicotine?
A: No, I didn't.
Q: When you—did you understand that when you blocked the holes you would get more tar?
A: No.

Q: Did it occur to you that if you blocked the ventilation holes on the cigarette that you would not achieve the benefit of the reduced tar and nicotine that that brand delivered?
A: Not really.
Q: Just didn't think about it?
A: No. I think the closing up [of] the holes would give you—you could taste the cigarette if you did that. If you didn't close the holes up you wouldn't taste the cigarette. Now, why that was the case, I don't know.

M. Little Dep. 2/24/99 at 44–46.[30] It is clear that an issue of fact exists as to

---

**29.** Plaintiff's expert Dr. Roggli testified that had Mr. Little not blocked the ventilation holes of Carlton cigarettes, he probably would

not have contracted lung cancer. Roggli Dep. at 236.

**30.** Amazingly, B & W cites the same pages of

whether Mr. Little believed that his ventilation blocking was negating the cigarettes' lower tar and nicotine delivery. Viewing the expert testimony and Mr. Little's testimony in the light most favorable to Plaintiff, the record is clear that Mr. Little manipulated the cigarettes in order to get a better taste, and that he did not know that such manipulation was affecting the tar and nicotine delivery of Carlton cigarettes. Furthermore, the testimony, as stated above, establishes that it was foreseeable that smokers such as Mr. Little would instinctively take such unhealthy actions.

Furthermore Lance Reynolds testifying on behalf of B & W individually and as successor to American, stated that the manufacturers of Carlton cigarettes did not have any scientific evidence that cigarettes with only one milligram of tar were a healthier alternative:

Q: Are you aware of any health benefit a smoker may receive by switching to a 1 milligram tar cigarette?

A: As I've said several times, if you take the common sense point of view that less is likely to be less hazardous, then yes, but that's not being substantiated by [sic] if you like long-term epidemiological study.

M. Lance Reynolds Dep. at 60. An issue of facts exists as to whether B & W's Carlton cigarettes were fit for their intended use as a safer and healthier cigarette.

Accordingly, the court denies B & W's motion for summary judgment on Plaintiff's breach of implied warranty claims.

## G. Whether Plaintiff May Maintain her Fraud Claim Against B & W

■ Under South Carolina law, a plaintiff must prove by "clear, cogent, and convincing evidence" the following elements in order to establish a fraud claim:

(1) a representation; (2) its falsity; (3) its materiality; (4) knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*First State Sav. and Loan v. Phelps*, 299 S.C. 441, 385 S.E.2d 821, 824 (1989); *Charleston Lumber Co. v. Miller Housing Corp.*, 318 S.C. 471, 458 S.E.2d 431, 436 (1995).

■ To the extent that Plaintiff alleges a fraud claim based on (1) the "Frank Statement to Cigarette Smokers,"(2) the "Cigarette Advertising Code," and (3) tobacco company executives testimony before Congress, B & W contends that there is no evidence that Mr. Little was aware of, or relied on, any of these allegedly false statements. Plaintiff has not offered any argument to the contrary regarding these three grounds. As the court found in its May 8, 2000 Order granting and denying in part summary judgment to Reynolds, Plaintiff has not presented any evidence that Mr. Little witnessed any of the tobacco executive's testimony. Order, May 8, 2000 at 11–12. As the court further found, Mr. Little conceded that he only viewed the "Frank Statement" in connection with this litigation. *Id.* at 21–22. Finally, the court concluded that Plaintiff has not presented any evidence that Mr. Little ever saw or relied on the Cigarette Advertising Code. *Id.* at 22–23. The same reasoning holds true here, and the court grants B & W summary judgment on any fraud claims based on the above three grounds.

---

the Mr. Little's deposition for the proposition that Little "candidly admitted that [his blocking of the ventilation holes] increased the delivery of tar and nicotine." Def. B & W's Mem. at 11 n. 4. This is disingenuous at best and at worst deliberate misrepresentation.

Plaintiff, however, further alleges that "[t]he marketing of low tar cigarettes was a deliberate attempt to give false reassurance to customers concerned about the health risks of smoking," as Defendants "understood the role of nicotine addiction in making smokers such as Mr. Little compensate to achieve a satisfactory dose of nicotine," and "designed products that registered as low tar when measured on smoking machines and reported on labels but that delivered high levels of tar to the smoker." Pl.'s Sec. Am. Compl. at ¶¶ 27, 28. Plaintiff further alleges that "[d]espite acknowledging the misleading nature of low tar advertising, Defendants viewed the situation as a 'marketing opportunity.' Defendants succeeded in convincing Martin Little that he was taking a positive health step in switching to a low tar cigarette." *Id.* at ¶ 31. Plaintiff points to the following memorandum, in both her Second Amended Complaint and her Memorandum Opposing Summary Judgment, by former B & W Vice President and General Counsel Ernest Pepples to demonstrate how the industry allegedly attempted to take advantage of consumers through misleading advertising:

> Inherent limitations of the FTC cigarette testing program, and borderline low-"tar" advertising practices resulting from the way the test results are reported have contributed to substantial consumer confusion and misunderstanding
> . . .
> The FTC reports highlight minute differences in "tar" delivery among different ultra-low brands. The FTC presentation of the test results implies that differences of 1 mg or less in "tar" delivery have meaningful health consequences, an unsupportable implication. This lends itself to misleading exploitation in some cigarette advertising.
> Current advertising for CARLTON, CAMBRIDGE, and NOW cigarettes, *all* of which claim to be "the lowest" in "tar" . . . are clearly confusing and misleading. Both CARLTON and NOW have used the lead, "lastest U.S. Gov't report." This kind of advertising exploits the FTC testing program to gain a competitive edge and to mislead consumers into believing that: (1) there is a measurable difference between cigarettes of .01 and .5 mg "tar" when, in fact, differences so small cannot be accurately measured by the test machine; and (2) "tar" differences of 1 mg or less have meaningful health effects, when there is no evidence that this is true.

Memorandum of Ernest Pepples, June 9, 1982, Pl.'s Ex. 63; *see also* Pl.'s Sec. Am. Compl. at ¶ 30 (quoting same in part).[31]

Defendants first contend that such allegations fail to comply with Federal Rule of Civil Procedure 9(a), which requires that plaintiffs plead the circumstances of fraud with particularity. According to the Fourth Circuit, the circumstances required to be pled with particularity under Rule 9(b) are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999) (citing 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed.1990)). Thus, a

---

**31.** The court notes that this memorandum was written long before B & W merged with American. Thus, this memorandum cannot be considered an admission by B & W as successor to American Tobacco that the Carlton advertisements were in fact misleading. The memorandum was clearly written on behalf of B & W in the context of B & W being a competitor of American Tobacco. Nonetheless, as will be later explained, the memorandum still may provide insight into whether the companies did in fact knowingly mislead consumers.

plaintiff may not satisfy Rule 9(b)'s requirements by "[m]ere allegations of 'fraud by hindsight.' " *Id.* (citing *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir.1994)).

■ As further stated by the *Harrison* court, Rule 9(b) has four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of.... Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Id.* (citations omitted). Thus, a court should be cautious about dismissing a complaint under Rule 9(b) if it is satisfied "(1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Here, Plaintiff's allegations in the Second Amended Complaint satisfy both conditions, as they make clear that her claims of fraud center around B & W's advertisements of low tar cigarettes as a healthy alternative, and B & W's alleged knowledge to the contrary. If B & W had any questions as to what exactly Plaintiff was referring, Plaintiff's citation to Ernest Peoples' memorandum concerning "misleading exploitation" in cigarette advertising should have sufficiently resolved them. Moreover, these allegations concern low tar cigarette advertisements which were employed over a period of years, and any failure to spell out every last detail of the alleged fraud is understandable. *See Wilson v. Brown & Williamson Tobacco Corp.*, 968 F.Supp. 296, 300 n. 4 (S.D.W.V. 1997) (asserting same) (citing 2 Moore's Federal Practice § 9.03(1)(b) nn. 14 & 15

("Because the complexity of each case will determine the amount of specificity required, misrepresentations that are too numerous and occur over extended periods of time must be alleged with somewhat less specificity. Although Rule 9(b) effectively modified the general notice pleading requirements of Rule 8(a)(1), Rule 8(e)(1) still dictates that each averment of a pleading of fraud be 'simple, concise and direct.' ")). Accordingly, the court denies B & W's motion to dismiss Plaintiff's fraud claim under Rule 9(b).

■ B & W next contends that Plaintiff cannot identify a specific advertisement upon which Mr. Little relied. While this may have been an accurate contention with regard to Reynolds' advertisements, *see* Order, May 8, 2000 at 15–20, it is not the case here. The testimony of both Mr. and Mrs. Little establishes an issue of fact as to whether Mr. Little did indeed view and rely upon Carlton advertisements. First, Mr. Little testified that around the time he switched to Carlton, he remembered seeing Carlton ads claiming their cigarettes were low in tar and nicotine. M. Little Dep. 2/24/99 at 50. In addition, Ms. Little testified that Mr. Little, at the time he switched cigarette brands, "explained that he was going to the Carltons because they were healthier, and that was his justification to me by saying, 'see how low they are in tar and nicotine ....' " S. Little Dep. 1/26/99 at 122–23. Ms. Little also testified that Mr. Little used to show her Carlton ads in order to prove to her that he was smoking low-tar cigarettes, *id.* at 134,175, and Mr. Little confirmed this. M. Little Dep. 2/24/99 at 72 ("Q: Are these—there was some testimony in your wife's deposition about how you would show her ads to demonstrate that you were smoking a low tar cigarette. Did you ever remember doing that? A: I may have said something to that effect, you know, yeah. "See here, this is less." Yeah, I do recall because—looking at the tenths of milli-

grams.").[32] Thus, by pointing out to his wife that with Carlton he was smoking a low-tar cigarette, Mr. Little was clearly relying on the truth of the ads, and the message of lower tar was material to his decision making. Moreover, such reliance was reasonable, as B & W concedes. *See* Gesell Dep. at 153 ("Q: Did you ever do any consumer research to determine why Carlton smokers switched from their other brands? A: It was really for lower tar. I mean, we did say Carlton was lowest, and that was very straightforward.").

B & W contends, nevertheless, that none of its advertisements contained false information concerning the levels of tar and nicotine in Carlton cigarettes. However, "[o]ne may deceive, though he says nothing which is itself untrue," as "[t]he telling of but part of the truth may sometimes effectually mislead." *Thermoid Rubber Co. v. Bank of Greenwood*, 1 F.2d 891, 894 (4th Cir.1924); *see Cox v. Edwards*, 8 S.C. 1, 1876 WL 5988, at *7 (S.C.1876) (asserting that "there is a misrepresentation if a statement is calculated to mislead ..."); F. Patrick Hubbard & Robert L. Felix, *The South Carolina Law of Torts* 331 (2d ed.1997) (stating that the general rule in South Carolina is that a statement that is literally true "is a false misrepresentation where the maker of the statement knows that the statement can be interpreted in a way that is false") (citations omitted). Here, Plaintiff claims that while the representations made concerning the low tar and nicotine levels of Carlton cigarettes were accurate, they nevertheless misled Mr. Little into thinking they were a healthier alternative. The Pepples memorandum suggests that statements used in Carlton's advertising campaign such as "Carlton is Lowest," were "borderline advertising practices" that were misleading the public into believing that minute differences in tar delivery levels had meaningful health consequences, "an unsupportable implication." *See* Memorandum of Ernest Pepples, June 9, 1982, Pl.'s Ex. 63.[33] Furthermore, the memorandum suggests that American sought to exploit such consumer misperception. *See id.*[34]

**32.** The fact that Mr. Little could not remember the specific ads which he showed his wife is immaterial, as Mr. Little clearly remembered relying upon Carlton ads proclaiming their cigarettes' low tar composition. As stated by B & W's expert, Eric Gesell, "the campaign umbrella was always Carlton is lowest ... whenever there was a brand, a style featured, forgetting about the specific line relative to the brand, it was always in conjunction with the Carlton is lowest umbrella." Gesell Dep. at 171. Mr. Little confirmed this sentiment when he described ads that he reviewed at his deposition and ads that he had seen when smoking as "basically variations of the same thing." M. Little 2/24/99 at 74. As stated *supra*, alleged misrepresentations that are too numerous and occur over extended periods of time need not be alleged with highly detailed specificity. *See Wilson*, 968 F.Supp. at 300 n. 4.

**33.** The court notes that Carlton's "10 to 1" ads, which represented that smoking ten packs of Carlton would provide a smoker with the same level of tar as smoking a single pack of competitor brands, were the subject of an FTC complaint alleging such ads to be misleading. *See* Compl., Plaintiff's Ex. 64. B & W ultimately agreed to sign a Consent Order in 1994 withdrawing the ads, which had been running since 1978. *See* Consent Order, Def. B & W's Ex. U.

**34.** Again, the court notes that the Pepples memorandum does not constitute an admission on the part of B & W as successor to American Tobacco. However, the memorandum, coupled with the testimony of Lance Reynolds regarding "compensation" (cited *infra*), raises the reasonable inference that American did knowingly mislead consumers. Further, the memorandum may be indicative of what was known in the industry at the time and therefore may be relevant for that purpose. Whether Plaintiff is able to proffer more complete evidence in support of this allegation may be revisited at the appropriate motions stage during trial.

In addition, the internal memorandum alleges that American attempted to exploit "inherent limitations" of FTC testing, *see id.*, which Plaintiff's expert testified was accomplished by producing a cigarette that delivered low levels of tar and nicotine to the FTC's testing machine, but high levels when used by smokers so as to satisfy their needs. Burns Dep. at 189. This disparity was due to the machine's inability to account for the phenomenon of "compensation," whereby a smoker takes more or deeper puffs of a lower-tar cigarette to satisfy his needs. *See* Compl. *In re The American Tobacco Co.*, Pl.'s Ex. 64 at ¶ 6. As Lance Reynolds admitted, while most people working in the field of smoking and health know about the phenomenon of "compensation," the average smoker does not. M.L. Reynolds Dep. at 44–45. Viewing the evidence in the light most favorable to Plaintiff, it is precisely this lack of knowledge upon which Carlton's manufacturer attempted to capitalize.

Accordingly, evidence has been produced from which a reasonable jury could conclude that B & W knowingly made misleading material statements with regard to its low-tar and nicotine cigarettes, with the hope of exploiting the public's confusion and misperception. Furthermore, a reasonable jury could conclude that Mr. Little, without knowing such statements were misleading, reasonably relied on such statements to his detriment. Accordingly, the court denies B & W's motion for summary judgment on Plaintiff's fraud claims.

## IV. *CONCLUSION*

It is, therefore,

**ORDERED**, for the foregoing reasons that Defendants Reynolds' and B & W's motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**. As to all of Plaintiff's claims against B & W individually, B & W's mo-tion is **GRANTED**. As to Plaintiff's pre-1969 failure to warn claims, Reynolds' motion is **GRANTED**. As to Plaintiff's Negligence and Strict Liability claims, Reynolds' motion is **DENIED**. As to the remaining claims against B & W as successor to American Tobacco (Breach of Implied Warranty, Fraudulent Misrepresentation, Negligence and Strict Liability), B & W's motion is **DENIED**.

**AND IT IS SO ORDERED**.